# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **SUGARLIPS BAKERY, LLC et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No. 3:20-cv-00830** |
| | ) | **Judge Aleta A. Trauger** |
| **v.** | ) | **(Lead case)** |
| | ) | |
| **A&G FRANCHISING, LLC et al.,** | ) | |
| | ) | *Consolidated with:* |
| **Defendants.** | ) | **3:20-cv-00831, 3:20-cv-00832,** |
| | ) | **3:20-cv-00833, 3:20-cv-00834,** |
| | ) | **3:20-cv-00835, 3:20-cv-00836,** |
| | ) | **3:20-cv-00837, 3:20-cv-00838,** |
| | ) | **3:20-cv-00843, 3:20-cv-00844,** |
| | ) | **3:20-cv-00845, 3:20-cv-00846** |
| | ) | **3:20-cv-00847, 3:20-cv-00848,** |
| | ) | **3:20-cv-00854, and 3:20-cv-00855** |

## MEMORANDUM

Defendants A&G Franchising, LLC ("A&G"), Alan Thompson, and Gina Butler have filed a Motion to Dismiss (Doc. No. 25), to which the consolidated plaintiffs have filed a Response (Doc. No. 31), and the defendants have filed a Reply (Doc. No. 34). For the reasons set out herein, the motion will be denied, with one small exception.

## I. BACKGROUND[1]

A&G is a Tennessee limited liability company with its principal place of business in Tennessee. (Doc. No. 1 ¶ 4.) Although A&G has now been dissolved as a formal business entity, it was, at one time, the franchisor of Gigi's Cupcakes ("Gigi's"), a chain of bakery shops.

---

[1] Each of these consolidated cases has its own Complaint, but those Complaints contain largely the same core allegations. For ease of reading, the court will cite to the Complaint of Sugarlips Bakery, LLC, Jason Vinyard, and Cheryl Vinyard. (Doc. No. 1.) The facts of each Complaint are taken as true for the purposes of the Motion to Dismiss.

According to A&G's 2015 pitch to potential franchisees, "[a] Gigi's Cupcakes bakery shop unit offers a variety of upscale cupcakes baked onsite, prepared and packaged specifically for delivery, take-out and onsite consumption." (Doc. No. 1-3 at 1.) The plaintiffs—who operated Gigi's franchises in states other than Tennessee[2]—refer to A&G as the "prior franchisor" of the Gigi's business, which the court takes to mean that the brand continues to exist, but not as operated by A&G. (*See also* Doc. No. 1 ¶ 39 (noting A&G's intent to sell the franchise system to a third party).)

By 2013, A&G had become "operationally insolvent"—that is, incapable of sustainably paying its ordinary business costs through its existing revenues.[3] (*Id.* ¶¶ 20–21, 27.) The company's net operational losses in 2013 were relatively small, but they did not remain so; by the end of 2014, the annual net loss was nearly $650,000. (*Id.* ¶¶ 21–22.) Nevertheless, A&G continued to recruit and enter into agreements with new franchisees. There is, at least as far as the plaintiffs allege, nothing inherently unlawful about A&G's decision to continue expanding despite its insolvency; a business is not required to cease functioning the moment it fails to make money. What *is* generally illegal, however, is resorting to fraud in order to recruit business partners who otherwise would not want to stake their own success on the future of a business incapable of sustaining itself. The plaintiffs in these cases allege that A&G—and its operators, defendants Alan Thompson and Gina Butler—did just that.

---

[2] Specifically, the plaintiffs operated franchises in Alabama, Arkansas, Colorado, Florida, Indiana, Minnesota, Mississippi, North Carolina, North Dakota, Ohio, South Carolina, and Texas.

[3] "Operational insolvency" is contrasted with "financial insolvency," in which a business is capable of covering its ordinary costs of operation but has "failed to achieve whatever growth or other benchmarks were anticipated in consummating a highly leveraged transaction." Scott Peltz, Financial Information–Sticking to the Basics, Am. Bankr. Inst. J., NOV 1994, at 15. A business that is only financially insolvent is one that is sustainable in its core operations but has entered financial distress because it is overleveraged. A business that is operationally insolvent is one that is failing and would be failing regardless of its debt load. Of course, many businesses are both.

Each plaintiff's story of how he, she, or it came to pursue a Gigi's franchise is unique in its particulars. These seventeen cases have been consolidated, however, because all of the parties agree that the franchisees' legal claims are, at least in most respects, fundamentally the same. (*See* Doc. No. 20 (Joint Motion to Consolidate Cases).) Specifically, each plaintiff's claims are "based on standardized Franchise Disclosure Documents ('FDDs') and Unit Franchise Agreements ('UFAs') for Gigi's Cupcakes franchises." (*Id.* ¶ 3.) Some plaintiffs' claims are based on slightly different versions of those documents than others, because aspects of the documents were revised over time. The parties, however, have jointly informed the court that the respective versions of the documents are "largely identical" and that, "[i]n most, if not all, cases, the material language at issue in Plaintiffs' Complaints is exactly the same." (*Id.* ¶ 2 & n.2.) Each UFA includes a clause stating that Tennessee law shall govern "any dispute between" the parties. (Doc. No. 1-1 at A-45.)

The Federal Trade Commission ("FTC") "requires franchisors to furnish prospective franchisees with disclosure documents"—that is, FDDs—"at least 14 calendar days before the prospective franchisee signs the franchise agreement." *Arruda v. Curves Int'l, Inc.*, 861 F. App'x 831, 835 (5th Cir. 2021) (citing 16 C.F.R. § 436.2(a)). An FDD must contain certain required information about the franchisor and the business being franchised, *see* 16 C.F.R. § 436.5, and "[a]ll information in the disclosure document" must "be current as of the close of the franchisor's most recent fiscal year." 16 C.F.R. § 436.7(a). The plaintiffs assert, upon information and belief, that A&G's FDD was "created, read, and approved" by Thompson and Butler. (Doc. No. 1 ¶ 17.)

The A&G FDD began with a "State Cover Page" that was, in essence, a letter to the potential franchisee, explaining the document and some aspects of the proposed transaction. The State Cover Page included a list of "RISK FACTORS" for the potential franchisee to "consider" before buying a franchise. (Doc. No. 1-3 at PageID #156.) Prior to 2017, however, the list of risk

3

factors made no mention of the company's financial struggles. (Doc. No. 1 ¶ 24.) For example, the 2015 version listed the risks as follows:

> 1. THE UNIT FRANCHISE AGREEMENT AND AREA DEVELOPMENT AGREEMENT REQUIRE YOU TO RESOLVE DISPUTES WITH US BY LITIGATION IN THE JUDICIAL DISTRICT WHERE OUR HOME OFFICE IS LOCATED, WHICH IS CURRENTLY IN WILLIAMSON COUNTY, TENNESSEE. OUT-OF-STATE LITIGATION MAY FORCE YOU TO ACCEPT A LESS FAVORABLE SETTLEMENT FOR DISPUTES. IT MAY ALSO COST YOU MORE TO LITIGATE WITH US IN TENNESSEE THAN IN YOUR OWN STATE.
>
> 2. THE UNIT FRANCHISE AGREEMENT AND AREA DEVELOPMENT AGREEMENT REQUIRE THAT TENNESSEE LAW GOVERNS EACH AGREEMENT (UNLESS AN ADDENDUM IS ATTACHED TO YOUR AGREEMENT WHICH PROVIDES OTHERWISE), AND TENNESSEE LAW MAY NOT PROVIDE THE SAME PROTECTIONS AND BENEFITS AS LOCAL LAW. YOU MAY WANT TO COMPARE THESE LAWS.
>
> 3. THERE MAY BE OTHER RISKS CONCERNING THIS FRANCHISE.

(Doc. No. 1-3 at PageID #157.)

The FDD also included a section designated as "Item 19," with the heading "FINANCIAL PERFORMANCE REPRESENTATIONS." (Doc. No. 1-3 at 29.) Item 19 featured two prominent tables, designated as "Table 1" and "Table 2." (*Id.* at 30–31.) Table 1 purported to provide the following aggregate information regarding "28 [Gigi's stores] which were open more than 12 months as of January 1, 2014": total net sales; cost of goods sold ("COGS"); labor, location, advertising, and operating expenses; and earnings before interest, depreciation, taxes, and amortization. (*Id.* at 30.) Table 2 provided per-store averages of the same information, based on the same 28 stores. (*Id.* at 31.)

The plaintiffs assert that the Item 19 tables were false and/or misleading in several ways. First, the plaintiffs allege that the labor costs in the figures were "understated by at least 20-33%," because they did not "take into account reasonable salaries paid to franchise owners who work at

4

the store," instead treating that substantial portion of labor costs as zero. (*Id.* ¶ 31.) Second, some of the stores used to calculate the figures in the Item 19 tables were not, in fact, franchises at all, but rather stores owned by A&G itself. Those stores, accordingly, did not have to pay any franchise royalties, making them inherently more profitable in a way that a franchised store could not be. (*Id.* ¶ 32.) These franchisor-owned stores, moreover, used at least some personnel who were paid out of central corporate accounts, not the budgets of the stores themselves, further skewing the figures. (*Id.* ¶ 33.)

Next, the plaintiffs allege that the net sales and COGS figures are simply outright misstated and cannot plausibly be reconciled with A&G's operating losses. (*Id.* ¶ 34.) Even if the figures were not actually falsified, the plaintiffs assert, they were "cherry picked"; there were actually nearly 70 stores that had been open more than 12 months as of January 1, 2014, and the stores included in the table were not representative. (*Id.* ¶ 35.) The existence of these other stores could be learned from closely reading the FDD, but that information was featured far less prominently than the large, "eye-catching" tables in Item 19. (*Id.* ¶ 36.) The plaintiffs claim that, if they had understood the actual performance of Gigi's franchises generally, as opposed to merely from an inflated picture of the selected stores, they would not have gone forward with their franchises. (*Id.* ¶ 39.)

Item 19, as the defendants point out, included the following disclaimer:

**Some Units earned this amount. Your individual results may differ. There is no assurance you'll do as well.**

Your results will vary depending on a number of factors which you should consider carefully in evaluating this information and in making any decision to purchase a franchise. These factors include: business skills, motivation, quality, effort, and effectiveness of the individual franchisee and of the franchisee's staff and management; the quality of your customer service; location of your Franchised Business; market conditions and raw material (for example, sugar and flour) price volatility; weather and climate conditions; the effectiveness of your marketing

5

efforts; the quality and effectiveness of your staff; income and demographic characteristics in your particular market area; the degree and quality of [remainder of sentence missing].

You should conduct an independent investigation of the costs and expenses you will incur in operating your Unit. We encourage you to consult with your own accounting and business advisors to assist you in preparing your budgets and projections, and to assess the likely or potential financial performance of your Gigi's Unit. We also encourage you to contact existing franchisees to discuss their experiences with the System and their business.

Written substantiation of the data we used in preparing the above table will be made available upon reasonable request.

Other than the preceding financial performance representation, Gigi's does not make any financial performance representations. We also do not authorize our employees or representatives to make any such representations either orally or in writing.

(Doc. No. 1-3 at 31–32.)

The FDD included, as Exhibit I,[4] A&G's audited financial statements for some past years. (Doc. No. 1-3 at 36.) Those audited statements, if read, appear to have been capable of providing a fuller picture of some aspects of A&G's business. The plaintiffs complain, however, that the portion of the FDD introducing the financial statements, Item 21, "provide[d] no explanation of [the] financial statements and otherwise [gave] no indication that [A&G] was experiencing financial difficulties." (Doc. No. 1 ¶ 25.) The plaintiffs also allege that A&G representatives "supplemented the[] omissions [from the FDD] by [orally] claiming there was a great demand for the Gigi's Cupcakes brand nationwide and that the franchise was growing rapidly each year, when in reality this was not the case." (*Id.* ¶ 26.)

The UFA, like the FDD, contained disclaimers, which differed some across successive revisions but were largely the same for all plaintiffs. Those disclaimers included both general statements about the lack of assured success and specific disclaimers of reliance on outside

---

[4] This refers to the letter "I," not a numeral.

documents or agreements other than the FDD and UFA. For example, a representative UFA provided:

> <u>Entire Agreement:</u> This Agreement, together with the Franchise Disclosure Document provided to Franchisee, contains all of the terms and conditions agreed and relied upon by the parties hereto with reference to the subject matter hereof. Franchisee and the Guarantors have not agreed or relied upon any other writings, representations, warranties, conditions or agreements, oral or otherwise, which shall be deemed not to exist or to bind any of the parties hereto. All present and prior agreements, understandings and representations are merged herein and superseded hereby. Franchisee represents and acknowledges that there are no oral or written contemporaneous agreements or undertakings between the parties that are not contained herein or in the Franchise Disclosure Document. No officer or employee or agent of Franchisor has any authority to make any representation or promise not expressly contained in this Agreement or in the Franchise Disclosure Document, and Franchisee agrees that it has executed this Agreement without reliance upon any such representation or promise. . . .

> <u>Success Not Assured:</u> Franchisor and its representatives have made or communicated to Franchisee no claims of assured or guaranteed success of the business contemplated by this Agreement . . . . Franchisee voluntarily enters into this Agreement and undertakes all the terms and conditions thereof without any such inducements, promises, or representations. Without limiting the foregoing, Franchisor expressly disclaims the making of, and Franchisee acknowledges that it has not received or relied upon, any representations, warranties or guarantees, express or implied, as to the potential volume, profits or success of the business venture contemplated by this Agreement, or as to the suitability of any selected or proposed Premises as a successful location of the Store.

(Doc. No. 1-1 at A-47 to -49.)

The UFA required franchisees to contribute a percentage of their "Gross Business Volume" to A&G for inclusion in an Advertising and Marketing Fund ("A&M Fund"). (Doc. No. 1 ¶¶ 78–79.) According to the UFA, A&G would use those funds to "exclusively maintain and administer any program Gigi's shall undertake for national and/or regional and/or local advertising, public relations, marketing and market research." (*Id.* ¶ 80; Doc. No. 1-1 at A-21.) The UFA assured franchisees that A&G could not use the A&M Fund to defray its own operating expenses, with the limited exception of operating expenses related to the administration of the A&M Fund itself.

(Doc. No. 1-1 at A-22.) The plaintiffs, however, rarely, if ever, saw or benefited from any A&G-provided advertising; it appeared, rather, that Gigi's was simply accepting the funds but providing little, if any, advertising support in return. Insofar as the A&M Fund was used for advertising, it was in support of A&G's own corporate-owned stores in Tennessee and Texas, not the franchisees, and the plaintiffs allege, on information and belief, that A&G diverted at least some of the funds to general operating expenses.[5] (Doc. No. 1 ¶¶ 82–83, 115.) A&G was required to provide a written accounting of the A&M Fund when requested by a franchisee, but, in at least some instances, it failed to do so. (*Id.* ¶ 85.)

Although the details vary between plaintiffs, the Gigi's franchises, generally speaking, did not experience results "anywhere near" those that Item 19 could be read to suggest were attainable. (*Id.* ¶ 45.) In light of those struggles and the franchisees' eventually learning more about what A&G had done to induce their participation in the franchise, the various plaintiffs in these cases filed Verified Complaints against A&G, Thompson, and Butler over the course of a few days, starting on September 28, 2020 and concluding on October 1, 2020. Although there is some case-by-case variation, the claims are fundamentally the same. First, the plaintiffs allege various theories of fraud and/or negligent misrepresentation. Next, they allege breach of contract and, in the alternative, unjust enrichment. They also seek declaratory relief, and, finally, they assert various miscellaneous claims pursuant to state statutes, as applicable based on the locations of the relevant franchises. (*Id.* ¶¶ 87–129; *see* Doc. No. 26 at 6 (listing claims under state laws other than Tennessee's.) Based on the parties' joint request, the court consolidated the cases. (Doc. No. 23.)

---

[5] The court construes this to refer to operating expenses other than the operating expenses of the Fund. It appears from the briefing that, if the court did not draw that reasonable inference, the plaintiffs would be prepared to amend their complaints to make the relevant distinction explicit. (*See* Doc. No. 31 at 20–21.) The court finds the implication to already be fairly drawn from the text of the Complaint and sees no need for amendment.

The defendants now seek dismissal, arguing that the plaintiffs' claims are untimely and fail as a matter of law.

## II. LEGAL STANDARD

### A. Rule 12(b)(6)

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that the plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

Case 3:20-cv-00830   Document 35   Filed 01/24/22   Page 9 of 25 PageID #: 495

## B. Rule 9(b)

Rule 9(b) of the Federal Rules of Civil Procedure states that, in addition to the ordinary pleading requirements of Rule 8, "a party must state with particularity the circumstances constituting fraud." The Sixth Circuit has explained that, while Rule 9(b) imposes a heightened standard, the underlying purpose of the rule is, in significant part, to serve the same ends as the general pleading requirements of Rule 8:

> [Rule 9(b)] should not be read to defeat the general policy of "simplicity and flexibility" in pleadings contemplated by the Federal Rules. Rather, Rule 9(b) exists predominantly for the same purpose as Rule 8: to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading. Rule 9(b), however, also reflects the rulemakers' additional understanding that, in cases involving fraud and mistake, a more specific form of notice is necessary to permit a defendant to draft a responsive pleading

*United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008) (citations and quotation marks omitted).

"So long as a [plaintiff] pleads sufficient detail—in terms of time, place, and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud—to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met." *Id.* "Rule 9(b) does not require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put [the opposing party] on notice as to the nature of the claim." *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012) (quoting *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 680 (6th Cir. 1988)).

## III. ANALYSIS

### A. Timeliness

The general rule is that "[s]tatute-of-limitations defenses are [more] properly raised in Rule 56 motions [for summary judgment], rather than Rule 12(b)(6) . . . motions, because '[a] plaintiff

generally need not plead the lack of affirmative defenses to state a valid claim.'" *Munson Hardisty, LLC v. Legacy Pointe Apartments, LLC*, 359 F. Supp. 3d 546, 567 (E.D. Tenn. 2019) (quoting *Paulin v. Kroger Ltd. P'ship I*, No. 3:14-cv-669, 2015 WL 1298583, at *4 (W.D. Ky. Mar. 23, 2015)). However, if it is "'apparent from the face of the complaint that the time limit for bringing the claim[s] has passed,'" then the plaintiff, if he wishes to avoid dismissal, has an "obligation to plead facts in avoidance of the statute of limitations defense." *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 520 (6th Cir. 2008) (quoting *Hoover v. Langston Equip. Assocs., Inc.*, 958 F.2d 742, 744 (6th Cir. 1992)). When "the allegations in the complaint affirmatively show that a claim is time-barred," then "dismissing the claim under Rule 12(b)(6) is appropriate." *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012). The defendants argue that many of the plaintiffs' claims are, on their face, untimely.

As the plaintiffs point out, however, Tennessee law calls on courts to apply the "discovery rule" to determine the date of accrual for most ordinary causes of action, including fraud. Under that rule, a cause of action accrues "when the plaintiff knows or in the exercise of reasonable care and diligence should know that an injury has been sustained as a result of wrongful or tortious conduct by the defendant." *John Kohl & Co. v. Dearborn & Ewing*, 977 S.W.2d 528, 532 (Tenn. 1998) (citations omitted). In other words, the plaintiff must not only have suffered "legally cognizable damage—an actual injury," but also "know or [be in a situation such that,] in the exercise of reasonable diligence[, he] should have known that this injury was caused by the defendant's wrongful or negligent conduct." *Id.* (citation omitted). Tennessee, moreover, recognizes the doctrine of tolling based on fraudulent concealment, which permits the tolling of a statute of limitations if the plaintiff can establish the following:

> (1) that the defendant affirmatively concealed the plaintiff's injury or the identity of the wrongdoer or failed to disclose material facts regarding the injury or the

wrongdoer despite a duty to do so; (2) that the plaintiff could not have discovered the injury or the identity of the wrongdoer despite reasonable care and diligence; (3) that the defendant knew that the plaintiff had been injured and the identity of the wrongdoer; and (4) that the defendant concealed material information from the plaintiff by withholding information or making use of some device to mislead the plaintiff in order to exclude suspicion or prevent inquiry.

*Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W.3d 436, 463 (Tenn. 2012) (internal footnotes and quotation marks omitted). For reasons that should be readily apparent, these two doctrines are often particularly relevant in cases involving fraud, given that the very essence of fraud is for the defrauded party not to realize he was wrongfully injured (or not realize it until too late to stop it). *See In re Estate of Davis*, 308 S.W.3d 832, 842 (Tenn. 2010) (noting that, although "fraud, standing alone, does not toll the statute of limitations[,] . . . the concealment of the fraud . . . tolls the procedural bar") (citing *Phillips v. Phillips*, 526 S.W.2d 439, 440 (Tenn. 1975)).

The court is persuaded that these cases are simply not ones in which resolving questions of timeliness on a Rule 12(b)(6) motion would be appropriate. There are too many potentially relevant factual questions that the Complaint does not—and was not required to—resolve. Ultimately, there may be plausible, and even persuasive, arguments that the plaintiffs would have quickly realized their wrongful injuries if they had simply engaged in reasonable inquiries based on what they already knew. The court, however, cannot assume that that is the case.

Indeed, the court cannot even assume, without evidence or context, what a reasonable inquiry in this field would look like. If anything, the defendants' own briefing on this issue illustrates that point. The defendants go through individual plaintiffs' allegations and purport to identify specific points at which individual franchisees' business struggles should have alerted them to potential fraud that they then could have discovered. (*See* Doc. No. 26 at 21–26.) But appropriately applying the discovery rule to each of those distinct, unique events would plainly require more background information than the court has or than the plaintiffs were required to

12

plead. Finally, as the plaintiffs point out, these cases present even more complex timeliness inquiries than most civil litigation, because these are not the first legal disputes involving many of the parties, and a savings statute may well apply. (*See* Doc. No. 31 at 17–19.) The court, accordingly, will deny the request to dismiss any claims for untimeliness, without prejudice to the defendants' raising the issue at a later time in the litigation.

## B. Claims Based on the Law of States Other than Tennessee

When a federal court hears a diversity action, "the law of the forum state, including the choice-of-law rules, appl[ies]," unless there is some situation-specific exception to the contrary. *Montgomery v. Wyeth*, 580 F.3d 455, 459 (6th Cir. 2009) (citing *Uhl v. Komatsu Forklift Co.*, 512 F.3d 294, 302 (6th Cir. 2008)). It is, moreover, well-settled that Tennessee "courts, as a general rule, honor and enforce . . . choice of law . . . clauses in contracts." *Walker v. Frontier Leasing Corp.*, No. E2009-01445-COA-R3-CV, 2010 WL 1221413, at *5 (Tenn. Ct. App. Mar. 30, 2010). Based on that principle (which Tennessee is far from alone in adopting), numerous courts—including this one—have applied choice-of-law clauses in franchise agreements despite franchisees' objections. *See Shoney's, Inc. v. Morris*, 100 F. Supp. 2d 769, 773 (M.D. Tenn. 1999) (Higgins, J.); *see also JRT Inc. v. TCBY Sys., Inc.*, 52 F.3d 734, 739-40 (8th Cir. 1995); *Momentum Marketing Sales & Servs. v. Curves Int'l, Inc.*, 2008 WL 11334569, at *4–5 (W.D. Tex. Dec. 17, 2008).

The defendants argue that the court should dismiss all of the claims pleaded under statutes of states other than Tennessee, on the ground that those claims are barred by the choice-of-law provision of the UFA. The plaintiffs concede that the choice-of-law provision is binding in most respects and that Tennessee law, therefore, governs most aspects of this case. They argue, however, that some plaintiffs "have laws other than Tennessee that apply to them based upon statutory and

13

common law principles in their respective states that void the choice of law provision in their UFAs because applying Tennessee law would be contrary to the public policy of their state." (Doc. No. 31 at 6.) For example, Minnesota's franchising statute forbids "[a]ny condition, stipulation or provision, *including any choice of law provision*" that purports to waive a party's rights under that statute. Minn. Stat. Ann. § 80C.21 (emphasis added). That provision, if applied, would prevent this court from construing the choice-of-law provision in the UFA to bar a Minnesota plaintiff's claims under the Minnesota statute. *See Moxie Venture L.L.C. v. UPS Store, Inc.*, 156 F. Supp. 3d 967, 971 (D. Minn. 2016) (acknowledging that Minnesota anti-waiver provision would bar choice-of-law provision's application to claims under Minnesota franchise statute but declining to apply that rule to common law claims).

Minnesota, of course, does not have an unfettered, unilateral power to bind Tennessee-based courts to apply Minnesota's statutes merely because Minnesotans happen to be litigants in a case. Rather, as another district court observed, "[t]he only way that the [franchise statute] of any particular state can make a choice of law clause void is if that particular state's law applies to the matter" in the first place. *Momentum Mktg. Sales & Servs., Inc.*, 2008 WL 11334569, at *2. Accordingly, for Minnesota law—or the law of any other relevant state—to apply in the manner that the plaintiffs urge, it must do so because the *Tennessee* choice-of-law principles that bind this court say that the other state's law should apply.

Fortunately, Tennessee's choice-of-law principles foresee and account for precisely this type of situation. Specifically, Tennessee law recognizes that a choice-of-law provision will not apply if it is "contrary to a fundamental policy of a state having [a] materially greater interest and whose law would otherwise govern." *Vantage Tech., LLC v. Cross*, 17 S.W.3d 637, 650 (Tenn. Ct. App. 1999) (quoting *Goodwin Bros. Leasing v. H & B Inc.*, 597 S.W.2d 303, 307 n.2 (Tenn.

1980)). That test, however, is not necessarily easy to apply in this instance. A state plainly has a significant material interest in the regulation of brick-and-mortar franchised businesses within its own jurisdiction, and there are grounds for considering such regulations to be "fundamental." Nevertheless, the home state of a franchisor also has a significant material interest in that business's ability to write and rely on uniform franchise agreements; indeed, predictability and uniformity appear to be at the heart of franchising as a practice.

This court is inclined to conclude that physical location of the actual store being regulated should win out, at least on the question of whether other states' franchising statutes apply to franchises within their borders. Nevertheless, as with the issue of timeliness, it is possible that the details of the parties' relationships will ultimately paint a different picture of the states' respective interests as litigation progresses. Accordingly, the court will deny the motion to dismiss the non-Tennessee law claims, but the court's ruling will be without prejudice to the defendants' raising these arguments again, based on additional information.

## C. Relationship Between FTC Act and the Plaintiffs' Fraud Claims

The defendants argue that the plaintiffs' fraud claims should be dismissed because they are based on FDDs governed by the FTC Act, 15 U.S.C. § 41 *et seq.*, and the FTC Franchise Rule, 16 C.F.R. § 436.1 *et seq.*, which do not create a private cause of action for their enforcement. The underlying principle on which the defendants' argument is based is sound; a plaintiff "may not, as a private party, invoke the jurisdiction of the federal courts to enforce the Federal Trade Commission Act," because "Congress has clearly limited the invocation of jurisdiction under the FTC Act to the Commission itself." *FTC v. Owens-Corning Fiberglas Corp.*, 853 F.2d 458, 464 (6th Cir. 1988) (citing *Alfred Dunhill, Ltd. v. Interstate Cigar Co.*, 499 F.2d 232, 237 (2d Cir. 1974)). As applied to these cases, however, the defendants' argument is without merit, because the

15

plaintiffs' complaints do not assert any cause of action under the FTC Act or the Franchise Rule; they are suing, rather, under state common law and various state statutes.

It might be problematic if the plaintiffs asserted that the defendants' claims were fraudulent *because* they violated the FTC Act or Franchise Rule. *See Morrison v. Back Yard Burgers*, 91 F.3d 1184, 1187 (8th Cir. 1996) ("A plaintiff should not be permitted to plead violation of FTC regulations as part of a state common law fraud case. A decision to the contrary could be interpreted as substituting violation of FTC regulations for state law requirements, thereby effectively extending a private cause of action under the Federal Trade Commission Act."). But that is not what the plaintiffs have done. To the contrary, as the defendants themselves note, the plaintiffs "do not cite directly to the FTC Act or the Franchise Rule in their Complaints" at all. (Doc. No. 26 at 8.) Rather, the plaintiffs simply argue that statements that happen to have been in the FDDs—but could just as easily have been made in oral representations, in correspondence, in pitch presentations, or elsewhere—were fraudulent under longstanding common law principles.

The defendants, moreover, notably do not argue that the FTC Act or the Franchise Rule *preempts* state fraud claims based on franchise relationships. If such preemption did exist, it would amount to a striking grant of immunity from ordinary fraud principles for franchisors. The defendants, however, request no such holding. They merely argue that, simply because the fraud claims overlap in their subject matter with some federal laws intended to be enforced by a federal agency, then the fraud claims are necessarily improper attempts to fashion a cause of action where none exists. But the duty to tell the material truth when doing business with others was not invented by the FTC, and it is not the FTC's exclusive responsibility to enforce it. Because the fraud claims are founded in state common law principles that have not been preempted, there is no basis for dismissing them based on the existence of partially overlapping federal law.

16

**D. Pleading of Fraud Claims**

1. Reasonable Reliance

Under Tennessee law, a plaintiff asserting fraud must establish

> (1) intentional misrepresentation of a material fact; (2) knowledge that the representation was false—that the misrepresentation was made knowingly or recklessly or without belief or regard for its truth; (3) reasonable reliance on the misrepresentation by the plaintiff and resulting damages; [and] (4) that the misrepresentation relates to an existing or past fact[.]

*Innerimages, Inc. v. Newman*, 579 S.W.3d 29, 42 (Tenn. Ct. App. 2019) (quoting *Dog House Investments, LLC v. Teal Properties, Inc.*, 448 S.W.3d 905, 916 (Tenn. Ct. App. 2014) (internal citation and quotation marks omitted)). The defendants argue that the plaintiffs have failed to adequately plead the third element—reasonable reliance—because no person could have reasonably relied on Item 19 in the manner that the plaintiffs allege, in light of the extensive disclaimer included, as well as the disclaimers in the UFA.

"Reasonable reliance is a question of fact." *Fulmer v. Follis*, No. W2017-02469-COA-R3-CV, 2018 WL 6721248, at *5 (Tenn. Ct. App. Dec. 20, 2018) (citing *Pitz v. Woodruff*, No. M2003-01849-COA-R3CV, 2004 WL 2951979, at *10 (Tenn. Ct. App. Dec. 17, 2004)). It is, moreover, a question of fact that must be based on a number of contextual factors, not merely the content of the statement itself. For example, Tennessee courts look to the following considerations when evaluating an assertion of reasonable reliance:

> (1) the plaintiff's business expertise and sophistication; (2) the existence of a longstanding business or personal relationship between the parties; (3) the availability of the relevant information; (4) the existence of a fiduciary relationship; (5) the concealment of the fraud; (6) the opportunity to discover the fraud; (7) which party initiated the transaction; and (8) the specificity of the misrepresentation.

*Id.* (quoting *Pitz*, 2004 WL 2951979, at *10). The disclaimers in Item 19 and the UFA may well present a substantial obstacle to a finding of reasonable reliance, regardless of all of those relevant

contextual factors. For the court to reach that conclusion pursuant to a Rule 12(b)(6) motion, however, the plaintiffs must have failed to plead any plausible basis for a finder of fact to adopt the plaintiffs' position, despite the factual and context-specific features inherent in the inquiry.

Ultimately, while the defendants have raised substantial arguments in their favor, the court cannot conclude that reasonable reliance was insufficiently pleaded. In addition to the inherently factual and contextual nature of the underlying inquiry, the court notes that the effect of a disclaimer on the reasonable reliance analysis depends on the details of the disclaimer itself, *see Bisig v. Time Warner Cable*, Inc., 940 F.3d 205, 212 (6th Cir. 2019), and nothing about the Item 19 disclaimer suggested that the information provided was useless or should not have been considered by a potential franchisee at all. The defendants are likely correct that it would have been unreasonable for a potential franchisee to assume that he would necessarily experience success comparable to that of the stores included in Item 19; he was explicitly told that he might not. The plaintiffs, however, do not claim to have been misled in so simple a manner. Rather, they argue that the information in Item 19 was false and misleading, even in its acknowledged context of merely providing examples.

Just because Item 19 was not a guarantee does not mean that relying on the information therein, as part of a holistic assessment of the franchise opportunity, was unreasonable as a matter of law. The plaintiffs, moreover, have plausibly alleged that Item 19 gave a false impression of the general viability of the Gigi's business, which could have induced reasonable reliance even by a person who understood that the information was not a promise or a depiction of every Gigi's store. The court, accordingly, will not dismiss the fraud claims on this ground.

18

## 2. Pleading with Particularity as to Each Defendant

In a fraud case with multiple defendants, Rule 9(b) requires that the plaintiff plead "specific allegations as to each defendant's alleged involvement." *N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 773 (M.D. Tenn. 2013) (Haynes, C.J.). Mere "'group pleading' . . . fails to meet . . . [Rule] 9(b)'s specificity requirements . . . ." *D.E.&J Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 730 (E.D. Mich. 2003), *aff'd*, 133 F. App'x 994 (6th Cir. 2005). The prohibition on group pleading under Rule 9(b) prevents a plaintiff from simply lumping multiple defendants together without explaining each defendant's culpable role. If each defendant's individual culpability is sufficiently pleaded, however, Rule 9(b) does not require a plaintiff to avoid the use of plural or collective language, where appropriate, for the sole purpose of *appearing* to be more scrupulously compliant with the Rule. Such freedom to use ordinary collective language, however, is premised on the plaintiff's adequately pleading fraud with particularity as to each defendant in other ways; if the plaintiff does not clear that initial bar with regard to any named defendant, the fraud claim against that defendant must be dismissed, or the plaintiff must amend his complaint.

The defendants argue that the plaintiffs have failed to plead, with particularity, what fraud is attributable to Butler and Thompson as individuals. As the plaintiffs point out, however, the Complaints clearly state that Thompson and Butler both, individually, participated in the drafting, review, and approval of the FDD—the document on which the fraud claims are based. (*See* Doc. No. 1 ¶ 17.) The plaintiffs may not know exactly how those responsibilities were divided, but there is no way that they could know that, prior to discovery. Rule 9(b) requires pleading with particularity; it does not require a plaintiff to see through corporate walls to know the details of internal deliberations. Moreover, individual plaintiffs also identify specific meetings and/or

19

conversations in which Butler and Thompson made specific representations about facts relevant to the potential franchisees' ultimate decisions. For example, the plaintiffs in the lead case assert that Butler and Thompson "assured [them] that the decline in revenue was a result of . . . poor management" by the prior franchisee of the stores they hoped to take over. (*Id.* ¶ 42.) While those oral representations may not have been sufficient, alone, to bind A&G, they are further evidence of the individual defendants' direct, personal role in the alleged fraudulent representations.

Under Tennessee law, "a member, holder of financial interest, governor, manager, employee or other agent may become personally liable in contract, tort or otherwise by reason of such person's own acts or conduct." Tenn. Code Ann. § 48-217-101(a)(3). The corporate form may shield such individuals from liability for the debts of their organization, but it does not give them license to commit fraud themselves and then defeat liability with a defense of "the corporation did it." The plaintiffs have alleged that Butler and Thompson themselves devised, oversaw, and executed the fraudulent scheme on which this case is premised—including by personally authoring and/or approving the fraudulent statements made. The court therefore will not dismiss the claims against them as individuals.

**E. Breach of Contract**

The defendants argue that the court should dismiss the plaintiffs' breach of contract claims based on the administration of the A&M fund, because the UFA granted A&G broad discretion to administer that fund. Under Tennessee law, however, it is well established that a contractual grant of discretion is not a license to exercise that discretion in any way whatsoever that the party desires. Rather, grants of discretion are construed to be "limited by the implied terms of good faith and fair dealing" in the performance of the contract. *Shuttleworth, Williams, Harper, Waring & Derrick, PLLC v. Gary K. Smith, Smith, Sabbatini & Mcleary, PLLC*, No. W2007-02295-COA-R3-CV,

2010 WL 744375, at *6 (Tenn. Ct. App. Mar. 5, 2010) (citing *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996); *Barnes & Robinson Co., Inc. v. OneSource Facility Serv., Inc.*, 195 S.W.3d 637, 642 (Tenn. Ct. App. 2006)). Moreover, even if Tennessee law did not construe contracts to contain such a duty, the UFA itself required A&G to exercise its discretion within its "reasonable business judgment" for the benefit of the "Gigi's System," not just for itself. (Doc. No. 1-1 at A-22, A-47.)

The plaintiffs have not alleged that A&G simply administered the A&M Fund poorly or spent the money in a way that the franchisees would not have. The plaintiffs have alleged that A&G wholly disregarded the purpose of the fund and redirected the moneys therein for forbidden purposes. If A&G did, in fact, behave in such a manner, it plausibly would have contravened both the express provisions the UFA and the implied duty of good faith performance under Tennessee law. The court, therefore, will not dismiss the breach of contract claims.

**F. Merger/Integration Clause**

A merger clause, also known as an integration clause, is a contractual provision establishing that the parties intended the written agreement to "embody their complete and exclusive agreement." *Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W.3d 671, 697 (Tenn. 2019). The parties agree that the UFA included such a clause, stating that the UFA and FDD amounted to the entire agreement between the plaintiffs and A&G. The extent to which those clauses affect these cases, however, is limited.

Although the defendants appeal to the merger clause in their briefing, the plaintiffs' Complaints rely very little on statements outside of the UFA or FDD to support any of their claims, and they do so primarily by stating that oral representations were used to bolster the written representations of the FDD that the merger clause explicitly recognizes as incorporated in the

agreement. The merger clause may ultimately have some bearing on what evidence the plaintiffs can rely upon in support of their claims, but nothing in the Complaints themselves suggests that any claim necessarily depends on excluded promises or representations. The court, accordingly, will not dismiss any claim on that ground.

## G. Unjust Enrichment

"Unjust enrichment is a quasi-contractual theory or is a contract implied-in-law in which a court may impose a contractual obligation where one does not exist." *Whitehaven Cmty. Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998) (citing *Paschall's Inc. v. Dozier*, 407 S.W.2d 150, 154–55 (1966)). "Courts will impose a contractual obligation under an unjust enrichment theory when: (1) there is no contract between the parties or a contract has become unenforceable or invalid; and (2) the defendant will be unjustly enriched absent a quasi-contractual obligation." *Id.* (citation omitted). "A contract cannot be implied, however, where a valid contract exists on the same subject matter." *Jaffe v. Bolton*, 817 S.W.2d 19, 26 (Tenn. Ct. App. 1991). Thus, a party seeking to recover under a theory of unjust enrichment "must demonstrate . . . [that] there [is] no existing, enforceable contract between the parties covering the same subject matter." *Smith v. Hi-Speed, Inc.*, 536 S.W.3d 458, 480 (Tenn. Ct. App. 2016) (citation omitted). The defendants argue that the court should dismiss the plaintiffs' unjust enrichment claims on the ground that such a theory of liability would only be viable in the absence of a binding contract, and each of the plaintiffs signed a version of the UFA.

In practice, however, plaintiffs frequently plead unjust enrichment claims in the alternative, in case the court holds that there was no contract or that whatever contract existed did not reach the particular subject matter at issue. Such claims often—in this court's experience, usually— prove to have been unnecessary, but there are legitimate and reasonable grounds for including

22

them. A plaintiff does not know, ahead of time, everything that a defendant will argue or everything that discovery may reveal. A plaintiff who believes himself to have a valid contract may not, in fact, have one, for any number of reasons. Unjust enrichment exists precisely for situations like that—where the conventional law of contract fails but the well-established law of equity might still support relief. It therefore typically makes little sense to require a plaintiff to choose between unjust enrichment and breach of contract at the pleading stage.

That, of course, does not excuse a plaintiff from the requirement to plead facts that would support an unjust enrichment claim, if his contractual claims somehow failed. These plaintiffs, however, have done so. They invested a great deal of their own time and money into their Gigi's franchises, based on the understanding that they were acting pursuant to enforceable contracts not procured by fraud. If the defendants improperly benefited from that arrangement, but the contracts are found not to apply, then the plaintiffs may have claims for unjust enrichment. The plaintiffs have, moreover, identified some reason to think that unjust enrichment may be necessary as a theory, in that they argue that the court may conclude that the UFA contracts were void *ab initio* due to A&G's fraud. (*See* Doc. No. 31 at 21.) The court, accordingly, will not prematurely dismiss the unjust enrichment claims.

## H. Declaratory Judgment

Finally, the defendants argue that the court should dismiss the plaintiffs' claims for declaratory judgment as redundant. This argument differs from the defendants' argument regarding unjust enrichment, in that, while the defendants acknowledge that breach of contract and unjust enrichment are distinct, alternative grounds for recovery but argue that the plaintiffs must pick one or the other, the defendants point out that a request for declaratory relief in this instance

is *not*, in fact, in any way distinct from the other claims asserted and does not rest on any alternative substantive right.

The defendants are correct. Indeed, courts routinely dismiss separate claims for declaratory judgment if those claims add nothing to a substantive dispute that is already fully addressed by other, concurrently pending claims in the same case and between the same parties. *See Malibu Media, LLC v. Redacted*, 705 F. App'x 402, 407 (6th Cir. 2017). The Declaratory Judgment Act, which grants this court the power to consider claims for purely declaratory relief, is an entirely "procedural" tool that leaves "substantive rights unchanged." *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191, 198–99 (2014) (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 509 (1959)). Sometimes, a plaintiff needs that procedural tool to obtain redress. These plaintiffs, however, have no particular need for such a mechanism, because all of their substantive rights are fully addressed by their other causes of action. The only basis that the plaintiffs have identified for needing declaratory judgment claims is that those claims would permit the court to resolve "all of the claims between the parties." (Doc. No. 31 at 22 (emphasis in original).) The plaintiffs, however, identify no particular rights or claims that declaratory relief would be necessary to reach. The way for the court to resolve "all" of the plaintiffs' substantive claims will simply be to resolve those substantive claims themselves—not to resort to considering an additional, procedurally unnecessary declaratory judgment action. The court, accordingly, will dismiss the plaintiffs' separate counts for declaratory judgment.

## IV. CONCLUSION

For the foregoing reasons, the defendants' Motion to Dismiss (Doc. No. 25) will be granted in part and denied in part. The claim for declaratory judgment stated by each plaintiff in these consolidated cases will be dismissed, but all other claims will remain pending.

24

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge